# STATE OF NORTH DAKOTA v. H. A. GILBERT.

(153 N. W. 1009.)

**Criminal action — extortion — conviction — appeal — evidence — verdict — sustained.**

From a conviction of the crime of extortion, defendant appeals. It is *held* that the evidence is sufficient to sustain the verdict.

Opinion filed July 8, 1915.

From the District Court of Bowman County *Nuessle,* Special Judge. Affirmed.

*Newton, Dullam, & Young* and *H. W. Olson,* for appellant.

The verdict is not sustained because it clearly appears that the defendant entered into negotiations with the complaining witness for the purpose of inducing him to pay a just debt to defendant, and because there is no evidence of any threat to accuse or prosecute the complaining witness.

Extortion is the obtaining of property from another with his consent, induced by a wrongful use of force or fear, or under color of official right. Comp. Laws 1913, § 9943; State v. Fordham, 13 N. D. 500, 101 N. W. 888; State v. Rechnitz, 20 Mont. 488, 52 Pac. 264; People v. Williams, 127 Cal. 212, 59 Pac. 581; Mann v. State, 47 Ohio St. 556, 11 L.R.A. 656, 26 N. E. 226; State v. Hammond, 80 Ind. 80, 41 Am. Rep. 791; People v. Griffin, 2 Barb. 427; State v. Bruce, 24 Me. 71; Com. v. Jones, 121 Mass. 57, 23 Am. Rep. 257; People v. Wightman, 104 N. Y. 598, 11 N. E. 135, 7 Am. Crim. Rep. 101; Reg. v. Richards, 11 Cox, C. C. 43; Reg. v. Coghlan, 4 Fost. & F. 316.

Mere false pretense is not enough. There must be a felonious intent. State v. Hollyway, 41 Iowa, 200, 20 Am. Rep. 586; Rex v. Hall, 3 Car. & P. 409; Hawk. P. C. chap. 34, § 14; 2 Archbold, Crim. Pl. Ev. & Pr. 366; Roscoe, Crim. Ev. 7th Am. ed. 910, and cases cited in notes; Rex v. Donnally, 1 Leach, C. C. 196, 2 East, B. C. 713, 783; 2 Am. Crim. Law, § 1697, and cases cited; 1 Russell, Crimes, 872; 2 Bishop, Crim. Law, 422, and cases cited; People v. Hall, 6 Park.

Crim. Rep. 642; State v. Bond, 8 Iowa, 540; Reg. v. Hemmings, 4 Fost. & F. 50; Crawford v. State, 90 Ga. 701, 35 Am. St. Rep. 242, 17 S. E. 628, 9 Am. Crim. Rep. 587; State v. Brown, 104 Mo. 365, 16 S. W. 406; Gant v. State, 115 Ga. 205, 41 S. E. 698; Driscoll v. People, 47 Mich. 413, 11 N. W. 221.

If there was a threat in this case, there is no evidence that it was such as would overcome a person of ordinary intelligence and prudence. Rex v. Southerton, 6 East, 140, 2 Smith, 305, 8 Revised Rep. 428; State v. Evans, Houst. Crim. Cas. (Del.) 97; 38 Cyc. 292.

Our statutes do not contain any such words or conditions in defining the crime. Comp. Laws 1913, § 9943.

A threat is any menace of such a nature and extent as to unsettle the mind of the person on whom it operates, and to take away from his acts that free, voluntary action which alone constitutes consent.

*Henry J. Linde,* Attorney General, *Francis J. Murphy,* and *H. R. Bitzing,* Assistant Attorneys General, for respondent.

The offense of extorting money from a person by means of threats was not known to the common law, and as it is known to-day, is of statutory origin. State v. Coleman, 116 Am. St. Rep. 457, note.

Under the statutes of the states of Ohio and Indiana, from which states defendant's counsel have cited authorities, the rule of construction is not the same as must obtain here. There the words "with intent to extort or gain" are used; or that "pecuniary advantage" must be sought. Our statutes do not contain any such words or conditions in defining the crime. Comp. Law 1913, § 9943; Re Sherin, 27 S. D. 232, 40 L.R.A.(N.S.) 810, 130 N. W. 761, Ann. Cas. 1913D, 446.

"A threat is any menace of such a nature and extent as to unsettle the mind of the person on whom it operates, and to take away from his acts that free, voluntary action which alone constitutes consent." 38 Cyc. 290; State v. Coleman, 99 Minn. 487, 116 Am. St. Rep. 460, 110 N. W. 5.

Goss, J. Defendant was convicted of extortion arising from his procuring one Andrew Byer to execute to him two promissory notes of $500 each, secured by chattel mortgage. The prosecution is based upon only one of said notes.

All testimony was received without objection, and no exceptions to instructions have been filed. From the denial of a motion for new trial defendant appeals. The only error assigned is alleged insufficiency of the evidence to sustain the verdict. Such insufficiency is specified as follows: (1) "There is no evidence that the defendant made any threats whatever against the complainant. (2) The evidence clearly shows that whatever was said by defendant to the complainant was said for the purpose of inducing the payment of a just debt and obtaining that to which he was entitled in justice and equity. (3) The evidence clearly shows that the complaining witness was guilty of the offense with which defendant charged him. (4) The evidence discloses no intent or purpose on the part of the defendant to extort property from the complaining witness without his consent, induced by wrongful use of force or fear, and that the wrongful use of force or fear was not the controlling cause of the delivery of property to defendant by the complaining witness. (5) The evidence clearly shows that the complaining witness was not a person of normal mind, and that such threats as were used by defendant did not constitute the wrongful use of force or fear. (6) The evidence clearly shows that the mind of the state's principal witness was so beclouded that he could not recall the things that had happened. That his testimony was in part suggested to him, and that is so vague, confused, and uncertain that a conviction based thereon cannot be sustained."

Appellant's counsel have discussed these questions together under the general proposition that "the verdict is not sustained because it clearly appears that the defendant entered into negotiations with complaining witness for the purpose of inducing him to pay a just debt to the defendant, and because there is no evidence of any threat to accuse or prosecute the complaining witness." Appellant contends it is established by the proof that "defendant had personal property, including certain shawls, in his building on his land. These were taken by the complaining witness. After it was discovered that the shawls had been stolen by complaining witness, defendant took up with him the matter of settlement. As a result of their negotiation the notes were executed. The shawls were not returned until after the execution of the notes. In the course of negotiations defendant told the complaining witness he would be 'as welcome to the notes as the

flowers in May, if the shawls were returned.' There is nowhere a scintilla of evidence which indicates that the defendant had any other purpose than to secure recompense for the valuable shawls. His language is not threatening in its character. He told Byer, according to the latter's testimony, that he had better 'fix the things up a little bit so there won't be any trouble about it. You don't want to be locked up. You are too old a man to be locked up.' Byer himself said that Gilbert never threatened. him, that he acted of his own free will and accord; that he thought signing the notes was the best thing he could do." These excerpts from his brief illustrate the substance of the claim of the appellant that the testimony is insufficient to support the conviction. Counsel has briefed quite elaborately upon the disputed question of whether good faith or a lack of a corrupt intent in the making of threats and obtaining money thereby is a good defense to a charge of extortion. But it will not be necessary to pass upon that question, as the record does not necessarily present it. The jury could have found that the defendant was not in good faith in his claim that the notes were obtained in settlement of a valid property claim of defendant. It is unnecessary, therefore, to pass upon whether a person can be convicted of extortion on a settlement of a valid or good-faith claim where the settlement is obtained under threats of a criminal prosecution. The authorities on the question are in irreconcilable conflict. Some hold that the employment of unlawful means, that is, threats to prosecute, are alone sufficient to constitute the crime, notwithstanding the intent with which the acts were done was but to procure one's own property or a settlement for it. On the other hand, equally reputable authorities claim that the ends obtained, as well as the means employed, must both be considered; and accordingly that it is not extortion to obtain one's own property or settlement of a bona fide claim of indebtedness by means of threats to prosecute for crime committed. Cases will be found cited on both sides of this proposition in note in 40 L.R.A.(N.S.) 801.

The testimony will now be briefly analyzed with reference to its sufficiency to sustain the verdict and on the bona fides of defendant's purported settlement of a debt by procuring the notes. The prosecuting witness Andrew Byer was sixty years of age. He had been injured some years before and was partially paralyzed. His memory is

shown to be at times faulty and unreliable. His condition is such that the jury might well find that he was an easy subject to influence. That he was what might be termed a "mark," overcredulous and easy to deceive. The setting of the case, the surroundings, the parties and the occurrences in evidence bearing on and leading up to the execution of these notes, are enough to at least excite the suspicion that the sequence of events did not occur accidently, but instead were brought about by someone, and that defendant could be that person, inasmuch as he was on hand at the finish to receive these notes as a result of what smacks as a conspiracy between him and some other parties to procure them in the exact way in which they were obtained. Byer was a bachelor and dwelt alone. One Clayton came to his house, spent two or three days with him, and finally induced him to go with him to an unoccupied dwelling house of defendant's 3 miles away and to remove some property therefrom. Clayton and defendant are shown to have been well acquainted. Defendant had been in the neighborhood three days before and left a horse with one Holbrook, living a quarter of a mile from defendant's dwelling house, and whom the evidence attempts to establish to have been left in charge of it, and defendant's property therein as well as that of defendant's wife also left in this vacant house through the winter. This property of the wife's was in an unlocked trunk in which she left shawls which she claims were of a value of $1,500, and the loss of which is made the basis of a claim as the consideration for the notes given by Byer to her husband, the defendant. Clayton and Byer, after loading the goods taken from this house into their sleigh, drive away from it some distance when they are overtaken by defendant. Clayton unhitched one of the horses and rode away on it, leaving Byer behind. Byer was kept in tow for some days, when he was taken to a bank and his notes were secured. At the time they were obtained the defendant asked the banker if they were buying notes and was informed they were not. Before they went to the bank, Byer testifies that Gilbert had told him that, "we better fix this thing up a little and I will hitch up the team." "You better fix this thing up so there won't be any trouble about it." "He thought it was the best thing we could do was to fix it up." "He said it would be the best thing to straighten it up. Nobody would know anything about it. If I did not fix it up I might get into trouble." "He says: 'You

don't want to be locked up. You are too old a man to be locked up.' "
"And that I was too old a man to get into any racket." That he "was
apt to go to jail from five to ten years" if he didn't sign the notes,
and that he "was too old a man to get into trouble, or to get into
jail." Byer states that as he did not want to get into any trouble
he thought it would be the best thing he could do was to sign the notes,
but that he was scared by what was said to him; and again he says that
he was not scared, but signed them of his own accord. "Before we went
to the bank, while in the hotel, Gilbert told me about certain valu-
able articles, something that was worth a whole lot of money, that had
been stolen." "He told me that when they were returned this note he
was going to sign would be given back, and that 'I would be as welcome
to it as the flowers in May,' but I never saw them. That was what he
said before we went to the bank. That was in the hotel. I didn't
like to go to the bank to sign these notes, but I thought it was better
to do that than to get into trouble. I had to take my medicine, that's
all." They then went to the bank. Gilbert got some blank notes and
a chattel mortgage blank, and filed the amount in the bank, had Byer sign
them by mark, he being unable to read, and the banker and parties pres-
ent witnessed them. One Edward Byer, a nephew of Andrew Byer,
a witness for the state, testified in substance that when he heard the
trouble his uncle was in he came up from Ellendale to see him; that
his uncle told him "that Gilbert would know about this trouble, and
to see him," which he did. "I first asked Gilbert what kind of trouble
my uncle was in, and he told me 'they wanted to keep it a secret; that
Andy didn't want it to get out.' I told him I was Andy's nephew,
and I came here to settle this thing up, if there was any way to do
so. He said he would have to see Andy first before he would tell me
what was the matter, because, he said, 'Andy didn't want anybody to
know of this.' Then he asked me if we had any mortgages on Andy's
property, and I told him my uncle had a mortgage on his property.
And then we went to the hotel and Gilbert took Andy up to his room
and had some little conversation there with him. I should judge
they were there ten minutes, and after being up there awhile, Gilbert
called me up there and told me how the deal was. Andy was there in the
room. I asked Gilbert what the trouble was first and what papers were
that Andy had signed, and he told me there were two $500 notes se-

cured by a chattel mortgage for the purpose of the two robes worth $600, and which they settled for $500 each, and then he told me how it was that these robes were stolen. He told me there was a man by the name of Clayton had got Andy to steal some stuff out of a certain house down in South Dakota. Then I asked him where the robes was, and he said they were in the house, and it seems as though there was nobody living there he said; and then I asked him how they got away with the robes; he said he didn't see anybody get them away, about the only way they could have been taken was that Clayton had on a big sheepskin overcoat and Andy wouldn't have seen them, and he thought that was the reason he rode off, wouldn't want to get caught. He told me these robes belonged to a woman up to New England. He wouldn't say who the woman was. At Scranton I asked him who this woman was, and he said it was a friend of his. He claimed that Andy didn't get these robes, but that Andy would be responsible as well as Clayton, for he was along with Clayton. He claimed that the robes had been stolen. One reason that he gave why Andrew Byer should settle this matter by giving these notes was because he was along and helped steal this stuff. He gave a further reason. He said this woman might prosecute him on two charges. I remember one was grand larceny and the other I couldn't say. He said Andy wouldn't have no witnesses on his side to help him out, and he would be pretty apt to serve his term in the penitentiary for five or ten years or such a matter. He asked me to release the mortgage that we had on Andy's property so that the woman would take a settlement without any further work. He wouldn't say who this woman was." They then went to Ludlow. At which place Gilbert said that the woman told him "that she didn't think the security was good enough unless we released the mortgage we had on Andy's stock." "The woman at that time was in the hotel; I had found out by that time who this woman was. They called her Mrs. Gilbert in the hotel, and that afternoon when Gilbert told me that this woman wouldn't want to accept this settlement unless we released this mortgage, I asked him if this was not his wife, and he said it was his wife. And Gilbert and I went into a room and by ourselves and talked the matter over, and I told him that if they wouldn't give us the team to give us the neighbor's horse anyway, as he needed the horse, and that the neighbor would like to have his horse. 'Well,' he says, 'I'll tell you

what I will do with you,' he says to me, 'If you put up $100 to show that you are in good faith I will let you have the horse.' I says, 'I haven't got $100, and I don't think I would have to put up $100 anyway because I think that Obert can come and get his horse anyway.' 'Well,' he says, 'if you put up 100 I will let you indorse it on the note yourself,' and then he pulled out these two $500 notes and showed them to me, secured by chattel mortgage. The note described in the information is one of these notes." "Gilbert told me that the woman owned these notes. When I seen that the note was made out to H. A. Gilbert, and the chattel mortgage was the same, I asked him how it came that they were made out in his name, and he says 'it was easier to do it that way at the time,' and he says 'he would indorse the notes because it wouldn't make so much trouble.' He offered to sell the notes to me after I asked these questions. After we got to talking about that, I told him he was in the automobile business in Ellendale and sold automobiles, and he asked me what kind of a deal I would give him on these notes; that he would trade these notes for an automobile; and then I asked him if these notes wasn't his; and he told me they wasn't his, but he said he could buy these notes, get them at reduced rates and give me a good deal on them. At the time I saw these notes and mortgage I noticed that there was a horse on the chattel mortgage, a stallion that didn't belong to Andrew Byer. I knew it wasn't Andy's. I made a remark about that to Gilbert at that time. He told me the stallion belonged to him, to Gilbert. He said: 'It would make the mortgage look better' and 'she would be more apt to accept it.' That was after he told me this woman was his wife." As the defendant did not testify, none of these statements are denied. Mrs. Gilbert, however, testified for the defense, and the "robes," under her testimony, turned out to be shawls of great value. One was an India shawl of a value of $1,000 and the other a camel's hair shawl worth $600, both belonging to her. That during or just before the trial, the shawls had been returned to them. Holbrook testified to a mysterious return, and that he then placed them in the top of the unlocked trunk belonging to Mrs. Gilbert, in the house from which it was alleged to have been stolen. And that either during or shortly before the trial, Mrs. Gilbert testified to telling Andy Byer, "You know, Mr. Byer, the shawls have been returned and you are welcome to your notes at any time." "I didn't want his

money at all." "He was welcome to it at that time." That he said "he would just like to let the case drop, and I was perfectly willing." "He called me girlie." "That was kind of an affectionate way of addressing me." That she owned the notes, but had left them in the possession of Gilbert's bondmen. "I never tried to assign them to anyboby." Van Bergan, whose name had been scratched out and the name of Peters inserted as an indorsement on the notes, "is a friend of mine." "He is in Minneapolis. I thought of sending them to Van Bergan, but I never did. I thought I would, because he was a friend. I thought possibly I would, but I changed my mind." Holbrook's testimony is conflicting and worthy of little credence. Although he testified that he "knew within ten minutes after the theft (of goods out of the dwelling house) had been committed that these goods had been stolen," yet it was not until the second day after he attempted to. find out where they went, although he was employed to guard them and knew defendant was in the neighborhood.

The conclusions to be drawn from the whole record are that these "robes" or "shawls" may never have been taken, or really may never have existed. They served at most as a mere pretense for the purpose of imposing upon the credulity of the simple-minded Andrew, whom the evidence shows was two weeks later placed under guardianship. That in all probability there was a conspiracy to do just what was done, namely, place Byer in the apparent position of having stolen something from the defendant to furnish a claim upon which, under a semblance of right, the property of Byer's could be filched from him. Threats were made by the defendant that Byer would be prosecuted. This is shown also by the testimony of the nephew, and the fact that defendant attempted to conceal from him the facts of the situation and represented that a woman at New England (his wife) would prosecute if the settlement did not stand and if a prior mortgage upon Andrew's property was not discharged. The testimony, in connection with this, including the fact that the notes and mortgage ran to the defendant instead of to his wife; that the defendant falsified the security and mortgage, placing therein some of his own property, under a pretense that it would better satisfy his wife and thus get her to approve of the situation; and his endeavor to sell the notes as well as to get the nephew to pay $100 to be indorsed on them,—all taken together are sufficient to make it highly

improbable, to say the least, but what the transaction was fraudulent in its inception; and that threats as testified to were likewise used upon the complaining witness as the means inducing his execution and delivery of the notes. The claim of good faith on the part of the defendant is highly improbable. It is in the case only by bare inference, and the jury would be warranted in finding he acted with criminal motive. On the whole, the evidence is sufficient to justify, as well as to sustain, the verdict, and the judgment is affirmed.